

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

ERIK KOPELMAN,

     Plaintiff,

   -against-

SMI MEDIA, INC. and TRINET
HR CORPORATION,

     Defendants.

-----------------------------------------------------------x

**VERIFIED
COMPLAINT**

Jury Trial Demanded

Plaintiff, Erik Kopelman, by and through his attorneys, LEEDS BROWN LAW, P.C., alleges upon knowledge as to himself and his own actions, and upon information and belief as to all other matters, as follows:

## BASIS OF CLAIM

1. This is a civil action seeking damages based upon the defendants' breach of contract, and any other causes of action which can be inferred from the facts set forth herein.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.  The amount in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2)-(d) because a substantial part of the events giving rise to the claim occurred in the District and the defendants regularly conducts business in New York County.

1

## PARTIES

4.     Plaintiff, Erik Kopelman ("Erik), was and still is a resident of the County of New York County, State of New York.

5.     Defendant, SMI, Inc. ("SMI") is a foreign business corporation incorporated in the state of Delaware.  SMI is an Australian information services company providing media agency expenditure data for all major media and product categories for the U.S., U.K., and Australian media markets.

6.     Defendant, TriNet HR, Inc. ("TriNet") is a foreign business corporation incorporated in the state of California.   TriNet is a cloud-based professional employer organization that administers payroll and health benefits and advises clients on employment law compliance and risk reduction, and handles human resource functions for various companies, including SMI.

## FACTS

7.     Erik has been a duly registered New York State Certified Public Accountant ("CPA") since October 1999.

*The terms governing Erik's employment with SMI*

8.     In December 2013, Erik entered into an employment agreement ("Agreement") to become SMI's Director of Finance.  Pursuant to the Agreement, Erik was to become a direct report of Laurel Touby ("Laurel"), Chief Operating Officer.

2

9.  Erik's employment commenced on January 7, 2014.

10.  In April 2014, SMI contracted with TriNet to permit TriNet to handle all SMI human resources functions.

11.  The contract between SMI and TriNet governing this transfer of responsibility (the "Contract") required that TriNet's employee handbook (the "Handbook") apply to all SMI employees.  The Contract states:

> You will comply with our human resources and service policies which are in the TriNet Employee Handbook and other documents we provide You. You will inform and consult with Us regarding any employee relations matter (such as termination, discipline, harassment, discrimination, retaliation, whistle-blowing, workplace violence, disability accommodation and leaves) prior to taking any employment related action. You must notify Us any complaint relating to the workplace immediately, but in no event more than seventy-two (72) hours later.

12.  The Handbook contains a Code of Business Ethics and Conduct (the "Code").  The Code states:

> Your company has a responsibility to conduct its business in strict compliance with all applicable laws and regulations, and it is the company's policy to do so. Your company therefore expects employees to act in accordance with the highest standards of business ethics both on and off company premises, to avoid any appearance of impropriety, and to observe all applicable laws and regulations while conducting business on the company's behalf.  You are expected to abide by the spirit as well as the letter of this Code. . . .
>
> Your company is committed to conducting business in a fair and open manner within the spirit and letter of the law, with the highest regard for customers, the community, and employees. . . . As such, all employees are required to maintain and uphold the following common ethical standards:
>
> - To pursue company objectives in a manner that does not conflict with the integrity of the company or the public interest;

3

- To be truthful and accurate in all you say and do;

- To observe all laws, regulations, ordinances, and rules applicable to the operation of the business;

- To maintain honest and fair relationships with all company vendors.


13.   Additionally, the Code promises that employees who report Code violations will not face retaliation:

> It is essential that all employees pay close attention to possible violations of the Code of Business Ethics and Conduct, whether they occur because of an oversight or intention. Any employee who is aware of possible violations should notify his or her manager, a company officer, a TriNet HR Representative, or, if applicable, your company's legal counsel. . . . It is company policy to encourage employees to come forward with any safety, ethical, or legal concerns. Retaliation against those who bring forward these types of related concerns or complaints will not be tolerated.

14.   In May 2014, SMI informed its employees, including Erik, that they were bound by the terms set forth in the Handbook, and required them to complete an online form acknowledging they received the Handbook and agreed to abide by it.  In relevant part, the form stated:

> I have received a copy of TriNet's Employee Handbook and agree to abide by the policies outlined therein …

***Erik is asked to prepare and submit inaccurate and/or misleading financial reports***

15.   On May 15, 2014, Sue Fennessy ("Sue"), Chief Executive Officer, asked Erik to prepare financial forecasts for SMI to entice potential investors to invest in the company.  Sue told Erik to use certain revenue numbers.  Erik explained to Sue that her proposed numbers were unrealistic based on SMI's historical performance and other data that is generally accepted as

4

reasonable for this purpose, which indicated the highest reasonable forecasts were substantially lower (less than 50%) than Sue's numbers. Erik also indicated that the financial forecasts must be approved by the board of directors (the "Board"), as was SMI's policy. Sue insisted that Erik prepare the financial forecasts using her numbers, and that he submit the reports to her directly without obtaining approval from the Board.

16.   On May 19, 2014, Erik submitted the financial forecasts to Sue using her numbers.

*Erik complains about the inaccurate and/or misleading financial reporting*

17.   On May 20, 2014, Erik emailed Laurel to complain that Sue forced him to prepare inaccurate financial forecasts. Erik explained why the numbers were unrealistic, and noted:

> Although I have more leeway with forecasts as these are predictive numbers, I still have an ethical duty to state my disagreement with management if the numbers are completely erroneous, flawed and inaccurate based on my industry knowledge, company knowledge and my professional experience.

18.   Erik voiced this and other complaints based, in part, on the ethical obligations set forth by the Code[1], and in reliance upon the Handbook's explicit representation that reporting ethical violations was encouraged and would not result in retaliation. The Handbook explicitly

---

[1] Deliberate financial misreporting is also prohibited under the professional code of conduct of the American Institute of Certified Public Accountants ("AICPA"). Among other things, the AICPA prohibits a CPA from knowingly misrepresenting facts or subordinating his judgment when performing professional services for an employer.

states that one of the people to whom Erik should report such conduct is his manager.[2]

19.   In response to Erik's disclosure, Laurel emailed David Kirk ("David"), Chairman of the Board, on May 21, 2014.   Laurel complained as follows:

> [Sue] is keeping material information from me, information I need to do my job, among other things.  Also, very worrisome, see below [email from Erik].  We are basically cooking the books to pull in new investors.  (Obviously, there is always some forecasting guesswork involved when you're at a startup, but this feels wrong, given our track record).  I feel lucky that Erik is bringing this to our attention and not hiding it.

20.   Erik also contacted David, as the handbook states that he could also complain to officers of the SMI.   On May 26, 2014, Erik complained to David about Sue's directives regarding the financial reports.   Erik told David of the issues noted above and also advised him that Sue was sending the reports to potential investors.   David asked Erik to send him these reports.

21.   On May 27, 2014, Erik emailed David the reports.   Erik said:

> This is the forecast that I prepared for [Sue], that I was very uncomfortable with the 2015 and 2016 numbers.  [Sue] had used this forecast with some U.S. investors such as [].

22.   On or about June 9, 2014, Laurel's employment at SMI ended.   Consequently, on June 10, 2014, after Laurel's separation, Erik became Sue's direct report.

---

[2] The AICPA also requires that a CPA report improprieties to their supervisor and appropriate higher levels of management, and requires that a CPA determine whether an organization's internal policies and procedures impose additional reporting requirements.

23. On July 1, 2014, one of SMI's largest clients, cancelled its contract with SMI.

24. When Erik learned of the cancellation, he discussed the matter with Brian Davis ("Brian"). Brian was a member of the board of directors as a "board observer" and an investor in SMI, who was actively involved in SMI operations, attending most, if not all board meetings, being vocal at such meetings, and exerting substantial influence on company operations. Brian advised Erik to tell David and SMI's potential investors about the cancellation. That same day, Erik emailed David regarding the cancellation, and asked whether potential investors were informed of the cancellation. David responded, stating that he had informed the potential investors.

25. On July 11, 2014, Erik submitted to the Board a weekly cash management report, which included information regarding the cancelled contract.

26. On July 12, 2014, in response to Erik's inclusion of information regarding the cancelled contract in the cash management report, Sue expressed anger that Erik included information about the cancelled contract.

27. On July 13, 2014, David emailed Sue and James Fennessy ("James"), the Chief Commercial Officer (Sue's husband), requesting information about the cancellation.

28. On July 14, 2014, James emailed Erik, stating that by disclosing the contract cancellation, Erik had "seriously undermined [James'] position and efforts."

29.   The same day, Sue chastised Erik for providing the cash management reports to the Board without her approval.  Sue alleged Erik was deceitful and disloyal for providing David and Brian with information about the cancelled contract.  Erik told Sue that it was his duty as the Director of Finance to convey this information.

30.   On July 29, 2014, as part of his routine job duties, Erik compiled documents to be used at the Board's July 31, 2014 meeting.  Among the documents Erik collected from the various SMI departments was a report from James that another client ("Client X") was extending its contract with SMI within two months.  However, the contract was scheduled to terminate in two weeks, and an extension to the contract had not been executed.

31.   On July 31, 2014, Erik emailed David regarding the meeting of the Board.  Among the items discussed was the NBC contract.  Erik said:

> [Client X] – I told James/Sue that [Client X] extension renewal is due on August 14[th] despite that it says 2 months in the board papers.  We simply need an email from [Client X] that they are extending the contract for another year.  A new contract does not need to be done.  James had me hold back billing them today for August because he and Sue are in conversations with them.  This extension is due in 2 weeks not 2 months.  See attached contract.  This is very concerning to me for the business as it represents more than 70% of U.S. revenue.

32.   On August 5, 2014, Erik met with Sue to request a raise in lieu of a bonus, as had been provided to many employees in the previous months.  The next week, Sue told Erik that she was uncomfortable with restructuring Erik's compensation because she was still upset that Erik had disclosed information to David and Brian, and had provided the Board with cash management reports without her approval.

8

33.  On September 29, 2014, Sue told Erik that an investor wanted an abbreviated financial update (the "Financial Update") for himself and the members of the Board.  Sue told Erik what kind of information should be included in the Financial Update, and Erik completed the report.

34.  On October 3, 2014, Sue sent the Financial Update to the investor and the members of the Board, but did not copy Erik on the email.  It was unusual that Erik was not copied on such an email.

35.  On October 7, 2014, Sue gave the Finance Manger a raise.  Unlike Erik, Nancy had never complained about financial reporting.  Sue also gave others in the company raises, but did not provide same to Erik despite his requests for same.

36.  On October 13, 2014, Sue asked Erik to prepare financial forecasts using revenue projections provided by James.  These forecasts were inaccurate and grossly inflated.  Erik complied.

37.  On October 15, 2014, Erik discovered that Sue had deleted material portions of the Financial Update she sent to investors and the Board, so that the Financial Update purported to show that the reason SMI had spent an abnormally large amount of cash was because of recruitment and legal fees.  However, SMI had not incurred any expenses in relation to such fees during the relevant period.

9

38.  On October 15, 2014, Erik met with Brian about Sue's lack of transparency, and told him that Sue had forced him to prepare a false financial forecast and that Sue had modified the Financial Update to include material misrepresentations.  Erik told Brian that he believed Sue provided these documents to another company in an effort to sell SMI or obtain additional investment.  In response, Brian told Erik he would discuss the matter with David and other SMI investors.

39.  After Erik's meeting with Brian, Erik emailed Gina Geomelos, Acting Corporate Secretary, noting that the Financial Update Sue had modified contained material misrepresentations regarding non-existent legal and recruitment fees.

40.  On October 16, 2014, Sue emailed Erik, asking him to make changes to an existing salary report and a false financial forecast based on vastly inflated figures.

41.  On October 17, 2014, Erik told Sue that he would not work on the salary report or financial forecast because she refused to tell him the purpose of the meeting for which she was using the reports (although Erik strongly suspected that the reports were to be used to secure a purchase or capital investment).

42.  During the meeting, Erik specifically told Sue that the numbers were "fake."

43.  Erik said that he would not use fake numbers to prepare a report.

10

44.  Sue responded that Erik needed to believe in the numbers.  Erik told her that the gross sales projections were inconceivable.

45.  Sue's proposed gross sales numbers for 2015 were more than three times higher than 2014 numbers; her proposed 2016 projections were five times higher than the 2014 numbers; and her proposed 2017 projections were seven times higher than the 2014 numbers.

46.  In light of SMI's 2014 growth, Erik believed that these numbers were unrealistic and Erik believed he was obligated by professional responsibility and the Code to refuse to prepare the reports in such a manner and to complain to Sue about the use of inaccurate reporting.

47.  In response to Erik's voicing these concerns, Sue demanded Erik's immediate resignation.  Erik refused to resign.

48.  Sue then fired him, and told others in the office staff that she was firing Erik because Erik thought Sue was not being transparent.

49.  Sue then threatened to call the police to remove Erik while he was gathering his belongings from his office.

50.  Sue fired Erik without any notice, despite knowing that Erik had his first child a mere two weeks before the termination.  Sue also did not pay severance or agree to pay severance until after Erik hired a lawyer who helped secure the 30 days severance which were

offered in the Handbook.

## CAUSE OF ACTION
(Breach of Contract)

51.     Erik and SMI entered into the Employment Agreement.   The Employment Agreement was a binding and enforceable contract.

52.     SMI and TriNet entered into the HR Contract.  The HR Contract was a binding and enforceable contract.

53.     By virtue of the HR Contract, all of SMI's employees, including Erik, were bound to follow TriNet's Code.

54.     TriNet's Code prohibited unethical business practices, such as using unrealistic projections in financial reporting, and required that employees who learned of such issues report them to a superior.  The Handbook also ensured that employees who reported such misconduct would not be subjected to retaliation, thus creating an express limitation on SMI's right to retaliate against an employee.

55.     Erik performed his employment obligations under the Employment Agreement and Code.

56.     Erik reported numerous violations of the Code, as detailed above.  In retaliation for doing so, SMI failed to provide Erik with a raise and terminated Erik's employment, in violation

of the Handbook's anti-retaliation provision, upon which Erik relied.

57.    By reason of the foregoing, Erik incurred damages (including lost pay and benefits) and is entitled to judgment against SMI and TriNet in an amount to be determined at trial, together with interest and costs.

WHEREFORE, Plaintiff demands judgment against the Defendants in an amount to be assessed by a jury, and any other damages permitted by law.  It is further requested that this Court grant any other relief to which Plaintiff is entitled.  Plaintiff demands a trial by jury.

Dated: Carle Place, New York
        February 11, 2015

Respectfully submitted,
LEEDS BROWN LAW, PC
*Attorneys for Plaintiffs*
One Old Country Road, Suite 347
Carle Place, New York 11514
(516) 873-9550

_____
       RICK OSTROVE

13

# VERIFICATION

STATE OF NEW YORK        )
                                          : ss:
COUNTY OF NEW YORK   )


ERIK KOPELMAN, being duly sworn, declares and says under penalty of perjury that I am the Plaintiff in the within action; that I have reviewed the foregoing Verified Complaint, and know the contents thereof; that the same are true to my own knowledge, except as to the matters herein stated to be upon information and belief, and that as to those matters I believe them to be true.


_____
ERIK KOPELMAN

Duly sworn to before me this
13 day of February, 2015

_____
Notary Public

FREDRIC OSTROVE
Notary Public - State of New York
NO. 02OS6121675
Qualified in Nassau County
My Commission Expires Jun 7, 2017